In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 22-1272

KARA ROSS,

*Plaintiff-Appellant,*

*v.*

FINANCIAL ASSET MANAGEMENT SYSTEMS, INC.,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:21-cv-00647 — **Thomas M. Durkin**, *Judge.*

_____

ARGUED NOVEMBER 28, 2022 — DECIDED JULY 14, 2023

_____

Before ROVNER, ST. EVE, and KIRSCH, *Circuit Judges.*

KIRSCH, *Circuit Judge*. Kara Ross sued a debt collector, Financial Asset Management Systems, Inc. (FAMS), alleging that phone calls she had received in connection with her husband's debt violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* The district court granted summary judgment to FAMS, concluding that Ross was not a "consumer" authorized to sue under § 1692g(b). The district court also concluded that no reasonable jury could infer that FAMS

violated § 1692d and 1692d(5); and even if it could, FAMS would be entitled to the bona fide error defense under § 1692k(c). Because we find the bona fide error defense shields FAMS from liability under all relevant provisions, we affirm.

I

Paul Camarena defaulted on a debt, then married Kara Ross. Because his default predates their marriage, Ross is in no way responsible for the underlying debt. Like many married couples, Ross and Camarena share a phone plan. They also share an office. And Camarena represents Ross in this case.

Financial Asset Management Systems mailed Camarena a letter to collect his debt on October 15, 2020. The letter informed Camarena of his right to dispute the debt within thirty days. The letter also identified FAMS's postal mailing address and website so that consumers seeking to dispute the debt could direct their dispute to those addresses. But Camarena never followed the letter's instructions, and FAMS never received any correspondence from Camarena through postal mail or its website.

Rather than follow FAMS's instructions, Camarena got creative. Although the notice included FAMS's website, it contained no employee email addresses—FAMS does not disclose employee email addresses on its website, nor does it provide its corporate officers' email addresses in correspondence to debtors. Undeterred, Camarena tracked down a document FAMS filed with a Massachusetts state agency, used that document to divine FAMS's employee email address format, and then sent emails disputing his debt to FAMS's CEO and Vice President of Operations on October 27 and 28.

Unsurprisingly, neither executive was a typical recipient of consumer disputes. Nevertheless, FAMS trains corporate officers to forward such emails to its client services department, which processes disputes. The CEO had no recollection of ever receiving or seeing Camarena's email and could not locate it in his inbox, while the VP of Operations found it in his deleted folder but could not recall ever seeing or deleting it. He testified that it was not his policy or practice to delete such emails without forwarding them to client services, yet he could not find a record of having forwarded Camarena's email. As such, client services never received notice of Camarena's dispute.

Had Camarena properly submitted his dispute, FAMS could have followed its policy and practice of stopping all collection activity until the account was validated. FAMS provides classroom-style training for collectors and client services employees on this policy, as well as specific training on how to code an account as disputed. This designation places the account in a dispute status, prompting the collection software to block collectors from calling the person associated with the account until validation is provided.

Around the same time, Ross began to receive calls from FAMS related to Camarena's debt. The day that FAMS mailed its letter, FAMS called Ross and asked to speak with Camarena. Ross informed FAMS that it had called her personal cell phone, which was not an appropriate number for Camarena. Still, Ross agreed to pass along a message to Camarena. FAMS's policy requires its collectors to carry out certain steps in the collection software after tagging a phone number as one that belongs to a third party. But the FAMS collector failed to properly code Ross's telephone number to prevent her from

receiving future calls, despite the collector's training and for reasons unknown to FAMS. FAMS called Ross again on October 16, 20, 22, 23, and 24, but Ross did not answer any of those calls. On October 28, Ross answered FAMS's call, and when the collector asked to speak with Camarena, Ross responded that Camarena was unavailable at her number and that she would not give out his personal number. FAMS called Ross again on October 29 and 30, as well as on November 2 and 3, but Ross did not speak with anyone from FAMS on those days. On November 2, FAMS called twice.

Ross testified that FAMS hung up on her during two of these calls, but she also suggested that she may have accidentally hung up on FAMS while trying to silence calls. To support her assertion that FAMS hung up on her, Ross pointed to her phone records and FAMS's own call log regarding the October 29 call; however, the phone records show only that she received the call from FAMS, and FAMS's call log indicates that Ross disconnected the call.

Ross sued FAMS, alleging that the calls violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* Ross asserted that FAMS had violated § 1692g(b) by continuing debt collection activities after Camarena disputed the debt and without first providing verification of the debt. Ross also alleged that FAMS violated § 1692d and 1692d(5) because (1) FAMS continued to call Ross after Camarena disputed the debt, (2) FAMS continued to call Ross after she notified FAMS that Camarena does not use her phone, and (3) FAMS disconnected calls with Ross after she answered. As a result, Ross alleged that the 12 unwanted phone calls were pestiferous and caused her to experience stress, which physically manifested in crying and difficulty sleeping.

Ross and FAMS each moved for summary judgment, and the district court granted FAMS's motion. The district court concluded that Ross could not bring a claim under § 1692g(b) because she is not a "consumer" for the purposes of that provision. The district court also concluded that a reasonable jury could not infer that FAMS had violated § 1692d and 1692d(5); even if it could, the district court found that FAMS would be entitled to the affirmative defense of bona fide error under § 1692k(c). Ross now appeals.

## II

We review de novo a district court's decision on cross motions for summary judgment. *Holcomb v. Freedman Anselmo Lindberg, LLC*, 900 F.3d 990, 992 (7th Cir. 2018). "[W]e construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001). We may affirm summary judgment on any ground that is supported in the record and adequately presented in the trial court. *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 359 (7th Cir. 2019).

## A

To begin, Ross argues the district court erred by finding that she was not a "consumer" under 15 U.S.C. § 1692g(b), which provides that if the consumer notifies the debt collector in writing that the debt is disputed within thirty days after receipt of the notice, the debt collector must cease collection of the debt until the debt collector mails verification to the consumer. The district court did not go on to consider whether FAMS was entitled to the bona fide error defense under § 1692k(c) for this particular claim. But even assuming that Ross is a "consumer" under § 1692g(b) and that FAMS

violated the provision, no reasonable jury could return a verdict for Ross due to the bona fide error defense. Thus, in the interest of efficiency and considering the plaintiff loses on the merits anyway, we assume, without deciding, that a private right of action exists here. See *Knopick v. Jayco, Inc.*, 895 F.3d 525, 529–30 (7th Cir. 2018); *Dunnet Bay Constr. Co. v. Borggren*, 799 F.3d 676, 689 (7th Cir. 2015).

The bona fide error defense requires a debt collector to show that (1) the violation was not intentional, (2) the violation resulted from a bona fide error, and (3) the debt collector maintained procedures reasonably adapted to avoid any such error. *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 537 (7th Cir. 2005). We review the bona fide error defense de novo, construing all facts and reasonable inferences in favor of the non-prevailing party. *Ewing v. MED-1 Sols., LLC*, 24 F.4th 1146, 1154 (7th Cir. 2022).

Ross did not challenge the first and second elements of the bona fide error defense in its response to FAMS's motion for summary judgment. Ross again does not dispute the first element of the defense on appeal, but argues that FAMS is not entitled to the defense because FAMS never addressed the second element before the district court. Thus, in Ross's view, FAMS never showed by a preponderance of the evidence that the violation resulted from a bona fide error, and the burden never shifted to Ross to challenge that element. But FAMS did address all three elements of the defense in its motion for summary judgment and in its response to Ross's motion for summary judgment. Ross's failure to challenge the first and second elements before the district court constitutes waiver. "When a party fails to develop an argument in the district court, the argument is waived, and we cannot consider it on

appeal." *Frey Corp. v. City of Peoria.*, 735 F.3d 505, 509 (7th Cir. 2013).

That leaves only the third element for our review: whether FAMS maintained procedures reasonably adapted to avoid the error. We conclude that it did. Procedures that are "reasonably adapted" to avoid errors are "mechanical or other such regular orderly steps to avoid mistakes." *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 587 (2010) (cleaned up). The defense does "not require debt collectors to take every conceivable precaution to avoid errors; rather, it only requires reasonable precaution." *Kort*, 394 F.3d at 539; see also *Hyman v. Tate*, 362 F.3d 965, 968 (7th Cir. 2004) ("Although [the debt collector] could have done more … § 1692k(c) only requires collectors to adopt reasonable procedures[.]"). This inquiry is "fact intensive," *Ewing*, 24 F.4th at 1155, and "susceptible of few broad, generally applicable rules of law," *Abdollahzadeh v. Mandarich L. Grp., LLP*, 922 F.3d 810, 817 (7th Cir. 2019). Compare *id.* at 817–18 (finding the debt collector's "unquestionably simple" procedures were "reasonably adapted"), with *Leeb v. Nationwide Credit Corp.*, 806 F.3d 895, 900 (7th Cir. 2015) (finding that "barring some action but saying nothing about what action to take" was not a "reasonably adapted" procedure) and *Ewing*, 24 F.4th at 1155 (finding that "to stop monitoring its fax inbox while allowing the system to continue sending confirmations that faxes had been received" was not a "reasonably adapted" procedure).

Ross contends that the email that the VP of Operations found in his deleted mail folder shows that FAMS did not maintain procedures reasonably adapted to avoid the error and did not have procedures to detect deviations from the

prescribed dispute procedures. Relying on a non-binding case, see *Morris v. Choice Recovery, Inc.*, No. 18-cv-05548, 2020 WL 6381926 (N.D. Ill. Oct. 30, 2020), Ross asserts that training employees is not enough.

But the record shows that training was not the only procedure that FAMS had in place, and the type of error here was different than in *Morris*. FAMS set up specific procedures to dispute a debt: FAMS mails a letter with instructions to dispute a debt that directs consumers to its website or standard mailing address, thereby seeking to avoid communications with corporate officers whose day-to-day duties seldom include consumer communications. Indeed, FAMS does not make those email addresses public. In the rare event that a corporate officer does receive such an email, FAMS trains corporate officers to forward this correspondence to its client services department. Client services, for its part, is trained to code the account as disputed. Once the account is coded as disputed, FAMS's collection software prevents collectors from contacting that account holder until validation is provided.

Despite his legal training and knowing better, Camarena deliberately circumvented FAMS's clear instructions for how to dispute his debt. Camarena pulled a Massachusetts registration document to unearth the email-naming conventions for FAMS's employees. He pieced together the emails for the company's most senior leaders, who are unrelated to the day-to-day responsibilities of consumer dispute communications. The CEO and VP of Operations have no recollection of receiving Camarena's email, and client services never received notice of Camarena's dispute.

The error here is distinguishable from the one in *Morris*, where the plaintiff faxed a dispute to the administrative team in charge of forwarding all disputes to a particular individual who logged the disputes in an internal database. 2020 WL 6381926, at *3. The error in *Morris* arose when an administrative team member forwarded the dispute to the wrong person, and the dispute was never logged in the internal database. *Id.* Unlike *Morris* where the plaintiff properly disputed the debt and the error occurred while executing a routine procedure, Camarena conjured an alternative channel to dispute the debt and thus no one at FAMS noticed the dispute, which would have kickstarted FAMS's procedures.

Ross contends that FAMS needed additional procedures to ensure that all disputes sent to officers were properly forwarded. But the absence of procedures designed to guard against malign conduct like Camarena's does not mean that FAMS failed to maintain "reasonably adapted" procedures. Nothing in the record suggests that FAMS would have violated § 1692g(b) had Camarena followed the instructions FAMS provided. See *Ewing*, 24 F.4th at 1155 (finding procedures were reasonably adapted where "[i]f [the debt collector's] step-by-step fax procedures had been followed, then the error that gave rise to this case would have been avoided"). FAMS's policies, procedures, and trainings were reasonably adapted to avoid the error occasioned by Camarena's self-help, and FAMS thus satisfies the third element of the bona fide error defense.

Construing all of the evidence in the light most favorable to Ross, FAMS took reasonable steps to avoid the bona fide errors caused by Camarena's behavior. See *Kort*, 394 F.3d at 539. So, even assuming Ross is a "consumer" under § 1692g(b)

and FAMS violated that provision, the bona fide error defense shields FAMS from liability under § 1692g(b).

B

Next, Ross argues the district court erred by finding that a reasonable jury could not infer that FAMS intended to annoy Ross, in contravention of 15 U.S.C. § 1692d and 1692d(5). Section 1692d provides: "A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." Section 1692d(5) specifies that a violation includes "[c]ausing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number." Ross argues a jury could infer that FAMS intended to annoy her by (1) continuing to call her after learning that Camarena (the debtor) did not use her phone, and (2) calling and then hanging up on her.

But, as with the § 1692g(b) violation, we can pretermit consideration of whether FAMS violated § 1692d and 1692d(5) because even if it did, the bona fide error defense precludes liability. Once more, Ross does not challenge the first element of the bona fide error defense—that FAMS's violation was unintentional. And Ross's failure to challenge the second element before the district court precludes our consideration of that element. *Frey Corp.*, 735 F.3d at 509. It is undisputed there was a bona fide error: FAMS failed to place Ross's number on a do-not-call list after tagging her number as the incorrect contact for Camarena. For the first time on appeal, Ross says that the second occurrence of the same error precludes a finding that the error was bona fide. Ross points out that FAMS failed to properly code Ross's phone number twice, following both

phone conversations, first on October 15 and again on October 28. Although Ross never argued this before the district court, she contends that the burden never shifted to her to challenge the second element because FAMS did not raise the second element before the district court. But FAMS did raise the second element before the district court. And once FAMS did so, the burden shifted to Ross to challenge each of the affirmative defense's elements. Her failure to do so then means she cannot do so now.

And just as with Ross's § 1692g(b) claim, FAMS satisfies the third element of the defense. Ross argues that the bona fide error defense does not preclude liability because FAMS failed to maintain procedures reasonably adapted to avoid calling a wrong number. Ross says that FAMS merely trained its agents on procedures but failed to maintain procedures reasonably adapted to avoid error. The record, however, shows that FAMS did both. FAMS had well-established and articulated procedures in place to tag incorrect phone numbers and place them on a do-not-call list. FAMS thus did more than merely explain what constitutes a violation of the FDCPA or bar some action—it provided specific "mechanical" and "regular orderly steps" to code a call, and thus block a number—once a caller explained that the number was incorrect. *Leeb*, 806 F.3d at 900. A human error in effectuating that process does not mean that the process did not exist.

Once Ross informed FAMS that Camarena was not available at her number during the October 15 call, the FAMS employee should have carried out these steps to code her telephone number. Despite the employee's training, the employee did not do so, and FAMS does not know why. In *Ewing v. MED-1 Sols., LLC*, we found the third element of the bona

fide error defense was satisfied where "the error that gave rise to this case would have been avoided" if the debt collector's "step-by-step" procedures had been followed. 24 F.4th at 1155. The same logic applies here: if FAMS's procedures had been followed, Ross's number would have been immediately placed on a do-not-call list, and Ross would not have continued to receive calls. That is all the third element requires of debt collectors.

Ross also argues that, although FAMS had audit procedures in place to review whether employees properly coded the phone numbers, FAMS did not specify the frequency of those audits. But because FAMS already established that it had provided reasonably adapted first-order procedures, the sufficiency of any audit procedures to verify compliance is immaterial to FAMS's bona fide error defense.

Finally, Ross asserts that FAMS intended to annoy her by calling and then hanging up on her twice, in violation of § 1692d(5). Ross relies on another non-binding case, *Pruden v. CitiMortgage, Inc.*, No. 12-cv-452, 2014 WL 2142155, (D.N.H. May 23, 2014), concluding that a reasonable factfinder could infer an intent to harass where the plaintiff produced undisputed evidence that she received at least 30 deliberate hang-up calls from the debt collector. Even assuming, without deciding, that the two hangups violated § 1692d(5), the calls underlying each hangup are still subject to the bona fide error defense—as detailed above, FAMS had policies and procedures that should have prevented these calls from going out to Ross in the first place. Because FAMS's bona fide error defense precludes liability on Ross's §§ 1692g(b), 1692d, and 1692d(5) claims, we affirm.

AFFIRMED